**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**WORCESTER DIVISION**

| | | |
|---|---|---|
| U.S. SECURITY ASSOCIATES, INC. and | ) | |
| UNIVERSAL PROTECTION SERVICE, LLC | ) | |
| d/b/a ALLIED UNIVERSAL SECURITY | ) | |
| SERVICES, | ) | |
| | ) | CIVIL ACTION NO. |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN PARRETTI, | ) | |
| AURY MALDONADO, and | ) | |
| CENTRAL PUBLIC SAFETY, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

---

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

---

NOW COME the Plaintiffs U.S. SECURITY ASSOCIATES, INC. ("U.S. Security") and

UNIVERSAL PROTECTION SERVICE, LLC ("Allied Universal") (together, "Plaintiffs") by

and through their undersigned counsel, and set forth this Complaint for Damages and Injunctive

Relief against the above-named Defendants JOHN PARRETTI ("Parretti"), AURY

MALDONADO ("Maldonado"), and CENTRAL PUBLIC SAFETY, LLC ("CPS") (collectively,

"Defendants").

## **INTRODUCTION**

1.

U.S. Security brings this Complaint for breach of contract, trade secret misappropriation,

violation of fiduciary duties of loyalty, unfair competition, aiding and abetting breach of contract,

aiding and abetting breach of fiduciary duties of loyalty, civil conspiracy, and intentional interference with contractual and advantageous business relations.

2.

U.S. Security is a security services provider that provides contract security guards at various locations across the nation.

3.

In or around August 2018, U.S. Security made a company-wide announcement that it would be acquired by Allied Universal.  At that time, Defendants Parretti and Maldonado, along with non-party Dina Malkasian ("Malkasian"), were employed as U.S. Security managers with responsibilities in either the Boston or Worcester, Massachusetts offices.  Although these individuals had short-term go-forward offers from Allied Universal, they resigned on October 25, 2018, in what now appears to be part of an orchestrated plan.

4.

Due to the suspicious nature of this collective resignation, Allied Universal reviewed the outgoing emails of these individuals and discovered that Malkasian had sent numerous emails containing highly sensitive, confidential U.S. Security information to her personal email account in the days leading up to her resignation.

5.

Equally as concerning, in late 2018, U.S. Security discovered that Defendant Parretti, Defendant Maldonado, and Malkasian were closely intertwined with competitor CPS.  Shortly after Parretti's, Maldonado's, and Malkasian's resignation, U.S. Security received an email inadvertently sent by a former employee and directed to Defendant Parretti discussing plans to

compete with U.S. Security in the region.  Around that same time, U.S. Security discovered a CPS uniform in the U.S. Security office out of which Malkasian worked.

6.

Unbeknownst to U.S. Security at that time, CPS had been formed by Malkasian's live-in boyfriend, Robert Erickson, and Shay Parretti, Defendant Parretti's wife, in or around December 2015 – nearly three years before either Parretti or Malkasian resigned their employment with U.S. Security.

7.

In early 2019, U.S. Security further learned that Defendant Maldonado is also working for CPS.  As of the filing of the present Complaint, U.S. Security has lost at least four accounts to CPS, and it is aware that CPS is actively bidding on other U.S. Security accounts.

8.

Plaintiffs seek injunctive relief to protect U.S. Security's trade secrets, other confidential and proprietary business information, and business relationships from the Defendants' unfair competition and otherwise wrongful conduct.  Plaintiffs also seek damages flowing from the Defendants' misconduct, in an amount to be determined at trial, and all other available relief.

## PARTIES, JURISDICTION, AND VENUE

9.

U.S. Security is a Delaware corporation with a principal place of business in Roswell, Georgia.  U.S. Security is a leading provider of security guard services and other security solutions to a wide range of industries.  U.S. Security provides contract security services involving, among other things, the provision of uniformed security officers at offices, retail establishments, and other

business locations.  U.S. Security has over 160 offices located throughout the United States, as well as certain international locations.

10.

Allied Universal is a limited liability company organized under the laws of Delaware, with a principal place of business in Conshohocken, Pennsylvania.  Allied Universal is a leading provider of security guard services and other security solutions to a wide range of industries. Among the services it provides are the provision of uniformed security officers at offices, retail establishments, and other business locations.  Allied Universal has over 240 offices located throughout the United States, as well as certain international locations.

11.

In or around October 2018, Allied Universal acquired the stock of U.S. Security, and U.S. Security became a wholly-owned subsidiary of Allied Universal.  Throughout early 2019, U.S. Security's operations merged into Allied Universal's operations, and all security operations relevant to this Complaint are now carried out by Allied Universal.

12.

Defendant Parretti is a former employee of U.S. Security.  Parretti resides in Worcester, Massachusetts.  Until late October 2018, Parretti worked for U.S. Security in the Boston and Worcester areas of Massachusetts.

13.

Defendant Maldonado is a former employee of U.S. Security.  Maldonado resides in Londonderry, New Hampshire.  Until late October 2018, Maldonado worked for U.S. Security in the Worcester, Massachusetts area.

14.

Defendant CPS is a competitor of U.S. Security and Allied Universal.  CPS is a limited liability company organized under the laws of Massachusetts with a principal place of business at 340 Main Street, Suite 853 in Worcester, Massachusetts.

15.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.*, thereby raising a federal question.  Plaintiffs' remaining claims likewise fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.

16.

Personal jurisdiction exists over Defendants in this District.  CPS is a business organized under the laws of Massachusetts and has a principal place of business in Massachusetts.  Parretti resides in Massachusetts and, upon information and belief, all of the conduct alleged against him in this Complaint occurred in Massachusetts and while he was employed by either U.S. Security or CPS in Massachusetts.   Upon information and belief, all of the conduct alleged against Maldonado in this Complaint occurred in Massachusetts and while she was employed by either U.S. Security or CPS in Massachusetts.

17.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because CPS has an office and regularly conducts business in this District; Defendant Parretti resides in this District; and Defendants Parretti and Maldonado routinely and regularly communicated with U.S. Security

personnel and customers in this District in person and by other means during their respective employment with U.S. Security.

## STATEMENT OF RELEVANT FACTS

### Dina Malkasian

18.

While not a party to this lawsuit, Malkasian is named as a defendant in a related lawsuit filed against her by U.S. Security in the United States District Court for the Northern District of Georgia, which remains pending and is in the discovery phase of litigation, *U.S. Security v. Malkasian*, Civil Action No. 1:18-cv-05559 (N.D. Ga.) (the "Malkasian Lawsuit"). Because Malkasian is integrally related to the facts of this case, the details of her involvement in this Complaint are set forth below.

19.

Malkasian is the sister of Defendant Parretti and the long-term girlfriend of Defendant CPS's half-owner.

20.

Malkasian commenced employment with U.S. Security in or about January 27, 2003, as an Operations Manager, and was later promoted to a Branch Manager overseeing the Worcester area. Malkasian worked from the U.S. Security office located at 67 Millbrook Street, Suite 213, in Worcester, Massachusetts.

21.

As a Branch Manager, Malkasian was responsible for, among other things, customarily and regularly soliciting customers or prospective customers, engaging in making sales or obtaining

orders for U.S. Security's services, ensuring customer satisfaction and professional performance of security personnel, negotiating customer account renewals, performing customer visits and post inspections, and building and retaining profitable business growth.

22.

As a Branch Manager, Malkasian had access to sensitive and confidential pricing information, business plans, marketing strategies, and other confidential, proprietary and non-public information.  In her role as Branch Manager, Malkasian regularly used this information to service U.S. Security accounts.  The information Malkasian accessed and used included trade secrets and included sensitive, confidential and proprietary information about U.S. Security's customers.

23.

While Malkasian worked primarily out of U.S, Security's Worcester office, she had access to information and documents relating to customers and employees of other U.S. Security branches, including U.S. Security's Somerville office outside of Boston, and she regularly shared information and documents with branch managers from other offices.  Additionally, Malkasian served as the primary customer contact for many accounts, such as large university hospitals and regional utility providers, which have locations throughout the state.

24.

On April 11, 2013, Malkasian entered into an employment agreement with U.S. Security, which contained certain restrictive covenants, including an 18-month restriction from working for a competitor of U.S. Security within 50 miles of U.S. Security's Worcester office, as well as customer and employee non-solicitation provisions and a provision prohibiting the use or disclosure of U.S. Security's confidential information and/or trade secrets.

25.

Malkasian resigned her employment with U.S. Security on October 25, 2018.  As set forth below, upon information and belief, Malkasian's resignation was coordinated with Defendants Maldonado and Parretti.

26.

Following her resignation, U.S. Security conducted a targeted search of the email correspondence that Malkasian had sent or received prior to her resignation from U.S. Security. Through its investigation, U.S. Security learned that, leading up to her resignation, including the day prior to and the day of Malkasian's resignation, she sent multiple emails containing confidential U.S. Security information and trade secrets, including U.S. Security financial information, customer lists, pricing, and bid proposals, from her U.S. Security email account to her personal email address.

27.

By way of example only, some of the information and documents Malkasian sent to her personal email during her final days of employment included the following:

- A customer contact sheet including not only contact information but hours billed at each site;

- Consolidated Income Statements for at least two different U.S. Security branches, including information such as "total revenues", "total payroll," "gross margins", and other sensitive information;

- A Consolidated Budget for U.S. Security's Worcester office;

- Entire security service contracts for multiple customers, including commercial establishments, government entities, and educational institutions;

- Other documents and correspondence showing billing rates for more than a dozen other accounts;

- A request for proposal template that could be tailored to prospective customers;

- Confidential post orders for certain sites outlining operational procedures and details;

- Internal correspondence from U.S. Security's CEO describing the integration process with Allied Universal;

- More than 100 pages of Scheduling Activity Reports detailing employee hours and wages throughout the region;

- A personnel file for another employee who reported to Malkasian, who has since left U.S. Security, as well as salary and pay history information for certain other employees; and

- Job descriptions and other new hire paperwork for various employment positions within the U.S. Security.

Upon information and belief, there was no legitimate reason form Malkasian to send such confidential and proprietary information to her personal email address on the eve of her resignation.

28.

Following unsuccessful attempts by U.S. Security to recover its confidential and proprietary information, including unsuccessful requests for assurances from Malkasian that the information had not been further used or disclosed to a third party, on December 6, 2018, U.S. Security filed the Malkasian Lawsuit.

29.

Upon information and belief, Malkasian has disclosed the information she misappropriated to the Defendants.   Upon information and belief, Defendants knew the information was

misappropriated from U. S. Security and/or conspired with Malkasian to misappropriate this information, and, upon information and belief, Defendants have used the information to unfairly compete with U.S. Security and to divert business from U.S. Security.

### John Parretti

30.

Parretti commenced employment with U.S. Security on or about June 13, 1994, as a Branch Manager.

31.

U.S. Security later promoted Parretti to Regional Manager.  Though he worked out of the U.S. Security office located at 5 Middlesex Avenue, Suite 325, in Somerville, Massachusetts, Parretti also serviced accounts out of other branch offices, including U.S. Security's Worcester office.

32.

As a Branch Manager, and later Regional Manager, Parretti was responsible for, among other things, customarily and regularly soliciting customers or prospective customers, engaging in making sales or obtaining orders for U.S. Security's services, ensuring customer satisfaction and professional performance of security personnel, negotiating customer account renewals, performing customer visits and post inspections, and building and retaining profitable business growth.

33.

As a Branch Manager, and later Regional Manager, Parretti had unfettered access to sensitive, confidential, and proprietary customer lists, pricing information, business plans, marketing strategies, and other non-public information.  In his role as Branch Manager, Parretti

regularly used this information to service U.S. Security accounts.  Such information included confidential, sensitive and proprietary information about U.S. Security's customers, including customers identified for the purposes of this Complaint as Customer 1, Customer 2, Customer 3, Customer 4, and Customer 5.

34.

While Parretti  was assigned to U.S. Security's Somerville office, which services accounts in and around Boston, he had access to information and documents relating to customers and employees of other U.S. Security branches, and he regularly shared information and documents with branch managers from other offices.  Additionally, Parretti was responsible for servicing certain accounts that fell within the geography of other branches, including Worcester, such as residential, healthcare, and armed services accounts outside of Boston.

35.

Through his employment with U.S. Security and using information and resources provided by U.S. Security, including confidential, sensitive and proprietary information about U.S. Security's customers, Parretti developed relationships and customer goodwill with U.S. Security's customers, including relationships with Customers 1, 2, 3, 4, and 5.

36.

U.S. Security expended substantial resources in developing Parretti's relationships and familiarity with the U.S. Security customers over whose business Parretti had responsibility. These relationships were developed for the benefit of U.S. Security and not Parretti individually.

37.

During his employment with U.S. Security, Parretti entered into two separate agreements setting forth his obligations to the company, both during and after his employment.  These

agreements were executed by Parretti on May 1, 2012 (the "2012 Parretti Agreement") and April 23, 2014 (the "2014 Parretti Agreement") (collectively, the "Parretti Agreements").  True and correct copies of these agreements are attached hereto, respectively, as **Exhibit A** and **Exhibit B**, and made a part hereof.

38.

The 2014 Parretti Agreement contains a non-competition covenant which states as follows:

> Employee agrees that during Employee's employment with Employer, Employee will not (either directly or by assisting others) compete with Employer or engage in any activity or pursue any interest that in any way conflicts with Employer's interest.  Employee agrees that during Employee's employment with Employer, Employee shall devote substantially all of Employee's time, energy and skill during regular business hours to the performance of the duties of Employee's employment and shall faithfully and industriously perform such duties, and shall diligently follow and implement all management policies and decisions of Employer.

> Employee further agrees that for a period of eighteen (18) months after the end of Employee's employment with Employer, Employer shall not (either on Employee's own behalf or on another's behalf) perform job activities of the type Employee conducted or provided for Employer within the two years prior to Employee's termination, for purposes of providing products or services that are competitive with products or services provided by Employer at the time of Employee's termination.  This restriction shall apply only within the territory where Employee is working for Employer at the time of Employer's termination.  Employee acknowledges that because of Employee's exposure to and knowledge of Employer's Trade Secrets and Confidential Information . . ., Employer has a legitimate business interest in restricting Employee's employment with its competitors and an eighteen (18) month period is a reasonable period of time after Employee's employment ends as a means of ensuring the Employer's Trade Secrets and Confidential Information are not disclosed to Employer's competitors or used to unfairly compete with Employer.

39.

The 2014 Parretti Agreement also contains a non-solicitation of customers covenant that states, in pertinent part:

Employee agrees that during Employee's employment with Employer and for a period of eighteen (18) months after the end of Employee's employment with Employer, Employee will not solicit or attempt to solicit (either directly or by assisting others) any business from Employer's customers or prospective customers which are actively being sought by Employer at the time of Employee's termination for the purpose of providing products or services that are competitive with the type of products or services provided by Employer at the time of Employee's termination. This restriction shall apply only to customers and prospective customers with whom Employee had Material Contact during the last two years of Employee's employment with Employer. For purposes of this Paragraph A "Material Contact" means contact between Employee and an existing or prospective customer of Employer: (a) with whom Employee dealt on behalf of Employer within two years prior to the date of Employee's termination: (b) whose dealings with Employer were coordinated or supervised by Employee within two years prior to the date of Employee's termination; (c) about whom Employee obtained Confidential Information in the ordinary course of business as a result of Employee's association with Employer within two years prior to the date of Employee's termination; or, (d) who receives services authorized by Employer, the sale or provision of which results or resulted in compensation, commissions, or earnings for Employee within two years prior to the date of Employee's termination.

40.

The 2014 Parretti Agreement also contains a non-raiding of employees covenant that states, in pertinent part:

Employee agrees that during Employee's employment with Employer and for a period of eighteen (18) months after the end of Employee's employment with Employer, Employee will not recruit, hire or attempt to recruit or hire, or solicit or encourage to leave their employment with Employer (either directly or by assisting others) any other employee of Employer with whom Employee had Material Contact during the last two years of Employee's employment with employer. For purposes of this Paragraph B "Material Contact" means contacts for the purpose of furthering Employer's business.

41.

The 2012 Parretti Agreement contains a provision regarding confidential information that states, in pertinent part:

Employee covenants and agrees, which covenant and agreement is of the essence of this agreement, that upon termination of his/her employment, whether voluntary

or involuntary, he[] will promptly deliver to the Employer all property, customer lists, sales information, memoranda, documents containing trade secrets, information relating to Employer's business and other confidential information and all other property belonging to the Employer and any and all copies thereof, and that he/she will not, either during the term of his[] employment under this agreement or any time thereafter, (1) disclose to any person, firm partnership, association or corporation, other than Employer, any trade secrets or other confidential information which was disclosed to him[] or came within his[] knowledge during the course of his[]employment, or (2) make or cause to be made any use of such trade secrets or confidential information.

42.

These provisions of the Parretti Agreements are necessary, reasonable, and narrowly tailored to protect U.S. Security's legitimate business interests, including its interest in protecting its trade secrets and confidential information, and its interest in protecting its customer goodwill with its customers.

43.

Parretti resigned his employment with U.S. Security on October 25, 2018 – the same day as Malkasian and Defendant Maldonado.

44.

On or about November 28, 2018, U.S. Security sent Parretti a letter to remind him of his obligations under the Parretti Agreements.  A true and correct copy of the letter to Parretti is attached hereto as **Exhibit C**, and made a part hereof.

**Aury Maldonado**

45.

Maldonado began employment with U.S. Security on or about March 5, 2007, as an Operations Manager.

46.

U.S. Security later promoted Maldonado to Director of Operations.  She worked out of the U.S. Security office located at 5 Middlesex Avenue, Suite 325, in Somerville, Massachusetts.

47.

As a Director of Operations, Maldonado was responsible for oversight of operations, including management of, *inter alia*, the Armed Special Police Officer residential sites, to ensure customer satisfaction and professional performance of security guards.  For many of those accounts she serviced, Maldonado acted as the primary customer contact.

48.

As a Director of Operations, Maldonado had unfettered access to sensitive, confidential, and proprietary pricing information, business plans, marketing strategies, and other non-public information.  In her role as Director of Operations, Maldonado regularly used this information to service U.S. Security accounts.  Such information included confidential, sensitive and proprietary information about U.S. Security's customers, including Customers 1, 2, 3, 4, and 5.

49.

While Maldonado worked primarily out of U.S, Security's Somerville office, which services customers in and arounds Boston, she had access to information and documents relating to customers and employees throughout the Northeastern United States.

50.

Through her employment with U.S. Security and using information and resources provided by U.S. Security, including confidential, sensitive and proprietary information about U.S. Security's customers, Maldonado developed relationships and customer goodwill with U.S. Security's customers, including relationships with Customers 1, 2, 3, 4, and 5.

51.

U.S. Security expended substantial resources in developing Maldonado's relationships and familiarity with the U.S. Security customers over whose business Maldonado had responsibility. These relationships were developed for the benefit of U.S. Security and not Maldonado individually.

52.

On February 15, 2007, Maldonado entered into an Agreement containing various employment and post-employment restrictions (the "Maldonado Agreement"). A true and correct copy of this Agreement is attached hereto as **Exhibit D**, and made a part hereof.

53.

The Maldonado Agreement contains a non-solicitation of customers covenant that states, in pertinent part:

> Employee agrees that from the commencement of []her employment until the termination of []her employment and for a period of two (2) years following the termination of such employment (whatever the reasons for such termination may be and whether such termination is voluntary or involuntary) that the Employee will not:

> Directly or indirectly, alone or in any capacity, within the geographic area in which []she actively works or worked for Employer or within the geographic area of Employee's responsibilities performed while in the employ of Employer, solicit, divert, accept, or take away for any competing business any customer of Employer who was such at any time during the one (1) year immediately preceding the termination of Employee's employment.

> Directly or indirectly, alone or in any capacity, within the geographic area in which []she actively works or worked for Employer or within the geographic area of Employee's responsibilities performed while in the employ of Employer, solicit, divert, accept or take away for any competing business any prospective customer of Employer whom the Employee actively solicited during the one (1) year immediately preceding the termination of Employee's employment.

54.

The Maldonado Agreement also contains a non-raiding of employees covenant that states,

in pertinent part:

> Employee agrees that from the commencement of []her employment until the termination of []her employment and for a period of two (2) years following the termination of such employment (whatever the reasons for such termination may be and whether such termination is voluntary or involuntary) that the Employee will not:
>
> Directly or indirectly, alone or in any capacity, within the geographic area in which []she works or worked for Employer or within the geographic area of Employee's responsibilities performed while in the employ of Employer, solicit, divert, hire or take away for any competing business any other employee of Employer who was such at any time during the one (1) year immediately preceding or following the termination of Employee's employment.

55.

The Maldonado Agreement also contains a provision regarding confidential information

that states, in pertinent part:

> Employee covenants and agrees, which covenant and agreement is of the essence of this agreement, that upon termination of []her employment, whether voluntary or involuntary, []she will promptly deliver to the Employer all property, customer lists, sales information, memoranda, documents containing trade secrets, information relating to Employer's business and other confidential information and all other property belonging to the Employer and any and all copies thereof, and that []she will not, either during the term of []her employment under this agreement or any time thereafter, (1) disclose to any person, firm, partnership, association or corporation, other than Employer, any trade secrets or other confidential information which was disclosed to []her or came within []her knowledge during the course of []her employment, or (2) make or cause to be made any use of such trade secrets or confidential information.

56.

These provisions of the Maldonado Agreements are necessary, reasonable, and narrowly

tailored to protect U.S. Security's legitimate business interests, including its interest in protecting

its trade secrets and confidential information, and its interest in protecting its customer goodwill with its customers.

57.

Maldonado resigned her employment with U.S. Security on October 25, 2018 – the same day as Defendant Parretti and Malkasian.

58.

On or about November 28, 2018, U.S. Security sent Maldonado a letter to remind her of her obligations under the Maldonado Agreement.  A true and correct copy of the letter to Maldonado is attached hereto as **Exhibit E**, and made a part hereof.  Maldonado never responded to that correspondence.

**Central Public Safety, LLC**

59.

According to CPS's Certificate of Organization filed with Massachusetts' Secretary of State, CPS is engaged in the business of "providing security services."  Such services include, upon information and belief, guard placement services at commercial and retail establishments in the area in and around Boston and Worcester, Massachusetts.

60.

Given the nature of services provided, CPS is a competitor of U.S. Security and Allied Universal.

61.

CPS was formed in or about December 2015.  Upon information and belief, CPS is owned equally by Robert Erickson and Shay Parretti.

62.

CPS's half-owner, Robert Erickson, is Malkasian's long-term boyfriend. Erickson and Malkasian live together at an address that is listed by the Massachusetts Secretary of State as the address for CPS's resident agent. During her employment with U.S. Security, Malkasian never disclosed that she lived or was romantically involved with the half-owner of one of U.S. Security's competitors, or that she had any involvement with CPS.

63.

CPS's other half-owner, Shay Paretti, is Defendant Parretti's wife. During his employment with U.S. Security, Defendant Parretti never disclosed that his wife was a fifty (50%) percent shareholder of one of U.S. Security's competitors, or that he had any involvement with CPS. Upon information and belief, Shay Parretti is an owner in name only, and the fifty (50%) percent ownership interest held in her name actually is controlled by Defendant Parretti. Indeed, U.S. Security has confirmed through other individuals with knowledge that Defendant Parretti is directly involved with CPS and its attempts to compete with U.S. Security.

64.

In late November 2018, approximately one month after Defendants Parretti and Maldonado resigned their employment, U.S. Security received an email from another former employee, Patricia Toomey, directed to Defendant Parretti at his former U.S. Security email address, presumably by mistake. The email had the subject of "Locations Worcester Boston Rhode Island – Invitation to Edit" and discussed "total hours" and "site names." That email was also directed to an email address that belongs to, upon information and belief, Shay Parretti. While later review revealed that the spreadsheet linked to that email did not contain information about U.S. Security

customers, it confirmed that Defendant Parretti was actively competing in the Worcester and Boston areas.

65.

In or about December 2018, U.S. Security learned of CPS's relationship to Malkasian and the other Defendants when it discovered  CPS uniform in U.S. Security's Worcester office, which uniform was, upon information and belief, new.   Upon information and belief, there is no legitimate reason why CPS items would be found on U.S. Security property.

66.

In or around the end of March 2019, U.S. Security learned that Maldonado was employed by CPS when she was seen on site on behalf of CPS at one of U.S. Security's customer accounts in Boston, identified for the purposes of this Complaint as Customer 2.

67.

Shortly thereafter, U.S. Security lost the above-referenced account with Customer 2 to CPS.

68.

Since CPS commenced operations in or around 2016, U.S. Security is aware of at least four customer accounts that it has lost to CPS, identified for the purposes of this Complaint as Customer 1, Customer  2, Customer 3, and Customer 4.   Customers 2, 3, and 4 have been lost since Defendants Maldonado and Parretti resigned their employment with U.S. Security.  U.S. Security also is aware of at least one other customer, Customer 5, for which CPS has submitted bids for security services.   Of the customers referenced above, each were serviced out of U.S. Security's Somerville office where Defendants Parretti and Maldonado worked, and Maldonado served as U.S. Security's primary point of contact for these customers.

69.

Upon information and belief, CPS has bid on, and continues to bid on, current and former accounts serviced by U.S. Security.

70.

Upon information and belief, CPS has received and/or used U.S. Security's confidential and proprietary information and trade secrets from Parretti, Maldonado, and/or Malkasian, including, without limitation, some or all of the confidential and proprietary information that Malkasian sent to her personal email address before her resignation.  Upon information and belief, CPS has used that confidential and proprietary information and trade secrets to unfairly compete against Plaintiffs.

71.

Upon information and belief, Parretti, Maldonado, and Malkasian have unfairly competed, and continue to unfairly complete, against Plaintiffs in violation of their respective agreements in order to immediately and wrongfully divert customers and business away from Plaintiffs.  Upon information and belief, Parretti, Maldonado, and Malkasian have committed these acts of unfair competition against Plaintiffs with the knowledge, consent, and assistance of CPS.

72.

Upon information and belief, in their employment with CPS, Parretti and Maldonado are performing the same or similar tasks as they did during their employment for U.S. Security.  Upon information and belief, Parretti and Maldonado are currently soliciting and communicating with at least some of the same customers and contact personnel that they solicited and communicated with while employed by U.S. Security.  Upon information and belief, it is inevitable that, in their

work for CPS, Parretti and Maldonado are relying upon – and will rely upon – trade secret information that they learned and/or acquired from U.S. Security.

73.

Upon information and belief, while Defendant Parretti and Malkasian were still working for U.S. Security, they were simultaneously helping to build CPS into a functioning competitor of Plaintiffs.

74.

Through Defendants' unlawful actions, including the misappropriation and use of U.S. Security's confidential information and trade secrets and Defendants' competitive actions in violation of the Parretti and Maldonado Agreements and other law, Plaintiffs have incurred and continue to incur damages, and they are at risk of losing more than $75,000.00 worth of future profits.

75.

Upon information and belief, U.S. Security has already lost business, including business from Customers 1, 2, 3, and 4, as a result of Defendants' unfair, tortious, deceptive and otherwise wrongful conduct, and U. S. Security has incurred, and Plaintiffs will continue to incur, monetary damages as a result of this lost business.

76.

The contractual breaches and wrongful conduct referenced above have and are likely to continue to cause immediate and irreparable harm to Plaintiffs for which there is no adequate remedy at law, including, but not limited to, the loss of customers, loss of business, goodwill, and disclosure of trade secret and confidential information.

## COUNT I: VIOLATIONS OF THE
## DEFEND TRADE SECRETS ACT OF 2016
**(All Defendants)**

77.

Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 76 of the Complaint as if fully set forth herein.

78.

The DTSA, which amended the Economic Espionage Act, 18 U.S.C. § 1832, to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures, or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

79.

During the course of their employment with U.S. Security, Parretti and Maldonado were provided access to and acquired substantial amounts of U.S. Security trade secrets (hereinafter "Trade Secret Information"), as described herein.  Such information included trade secret information about U.S. Security's business, finances, customer lists, and sensitive, confidential and proprietary information about U.S. Security's customers.

80.

Such trade secrets are developed and maintained by U.S. Security at great time, cost and expense to U.S. Security, and are maintained on password protected networks accessible only by

certain U.S. Security employees with need to use such information on U.S. Security's behalf.  U.S. Security instructs these employees to keep Trade Secret Information confidential.

81.

U.S. Security's Trade Secret Information is not available to the general public and is closely guarded by U.S. Security.  U.S. Security keeps such information strictly confidential in order to maintain a competitive advantage.  Pricing information and customer contact information could be used by competitors to unfairly poach business.

82.

U.S. Security's Trade Secret Information entrusted to Parretti and Maldonado, including the information identified herein that they are improperly in possession of, are trade secrets under the DTSA, 18 U.S.C. § 1832 *et seq.*, because U.S. Security derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

83.

Upon information and belief, Defendants also acquired U.S. Security's Trade Secret Information from Malkasian, who sent numerous email messages containing U.S. Security's Trade Secret Information to her personal email address in the last two days of her employment with U.S. Security, and/or through other improper means without authorization.

84.

Upon information belief, Defendants have used or disclosed, or intend to use or disclose, U.S. Security's Trade Secret Information in violation of the DTSA.

85.

Upon information and belief, Defendants have used or disclosed U.S. Security's confidential customer information for their own benefit, including the information that Malkasian misappropriated on the eve of her resignation.   Upon information and belief, Defendants knew that Malkasian had misappropriated such information and/or conspired with her to obtain the information.

86.

Defendants knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by U.S. Security at great expense and effort; (4) was maintained as confidential and is not generally available to the public and U.S. Security's competitors; (5) would provide significant benefit to a person or company seeking to compete with U.S. Security; and (6) is critical to U.S. Security's ability to conduct its business successfully.

87.

Defendants and/or other third parties with whom Defendants have shared U.S. Security information will be or are unjustly enriched by the misappropriation and/or threatened misappropriation of U.S. Security's Trade Secret Information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate U.S. Security's Trade Secret Information.

88.

As a result of the threatened and/or actual misappropriation of U.S. Security's Trade Secret Information and other confidential information, Plaintiffs will be threatened with loss of business

expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

89.

In addition, Plaintiffs seek actual, incidental, compensatory, punitive, and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

90.

Because Defendants' misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Plaintiffs request that this Court grant injunctive relief against Defendants from actual or threatened disclosure or utilization of U.S. Security's Trade Secret Information, in addition to granting Plaintiffs their attorneys' fees and exemplary damages.

## COUNT II: TRADE SECRET MISAPPROPRIATION UNDER COMMON LAW AND M.G.L. C. 93, § 42
### (All Defendants)

91.

Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 90 of the Complaint as if fully set forth herein.

92.

By virtue of their employment and responsibilities, Parretti and Maldonado were given access to Trade Secret Information, which was valuable to U.S. Security's business and gave U.S. Security an advantage over competitors.

93.

U.S. Security has expended significant amounts of time and money developing its customer roster and developing its services to support and grow its base of customers and Trade Secret

Information, all of which are highly valuable to Plaintiffs and to any other person or entity that renders the same or similar services, such as CPS, Parretti and Maldonado.

94.

U.S. Security takes and has taken reasonable steps to preserve the secrecy of its Trade Secret Information and other confidential and proprietary information, including by its course of supervising, instructing, and monitoring its personnel to guard against disclosure, and entering into non-disclosure agreements with its employees to protect such information.   Plaintiffs derive independent economic value from the fact that the information is not generally known to the public or to U.S. Security's competitors.

95.

Parretti and Maldonado had and have a continuing duty to maintain confidentiality of trade secrets and other confidential and proprietary information, as well as a continuing duty not to use, exploit, or divulge such information other than in connection with the performance of their duties for U.S. Security, for the benefit of U.S. Security and pursuant to authorization by U.S. Security.

96.

Upon information and belief, Defendants have, through improper means, taken, used, and/or disclosed U.S. Security's Trade Secret Information and other confidential information in an effort to lure customers away from Plaintiffs and/or provide competing services to such customers.   Such conduct is in direction violation of Parretti's and Maldonado's express obligations to U.S. Security, as well as independently unfair and wrongful.

97.

Upon information and belief, Defendants have knowingly received the benefits from the disclosure and/or use of U.S. Security's Trade Secret Information and other confidential

information.

### 98.

As a direct and proximate result of Defendants Parretti and Maldonado's violation of their express obligations and other wrongful conduct, and as a result of CPS's knowing receipt and, upon information and belief, use of U.S. Security's Trade Secret Information, U.S. Security and Allied Universal have and will continue to suffer substantial direct and consequential damages in an amount to be established at trial.

### 99.

Defendants' conduct in misappropriating U.S. Security's Trade Secrets was willful, wanton, and malicious for all of the reasons described above.

### 100.

As a direct and proximate result of the Defendants' wrongful conduct, U.S. Security and Allied Universal has suffered and will continue to suffer damages, as well as irreparable harm that cannot be adequately redressed at law.

## COUNT III:  BREACH OF CONTRACT
### (Parretti and Maldonado)

### 101.

Plaintiffs incorporate by reference Paragraphs 1 through 100 of the Complaint, as if fully set forth herein.

### 102.

The Parretti Agreements and the Maldonado Agreement are valid, enforceable, and binding contracts.

103.

U.S. Security at all times performed its contractual obligations under the Parretti Agreements and the Maldonado Agreement.

104.

Based on Parretti and Maldonado's conduct alleged above – specifically using U.S. Security's Trade Secret Information to unfairly compete against U.S. Security and solicit U.S. Security customers and/or working for or as a competitor while still employed with U.S. Security – Parretti and Maldonado have committed material breaches of their respective agreements with U.S. Security.

105.

As a result of the breaches described above, including breaches that are currently ongoing, U.S. Security and Allied Universal have been injured and will continue to suffer damages, in an amount to be determined at trial.

106.

In addition, U.S. Security and Allied Universal will suffer irreparable harm if Parretti and Maldonado are not enjoined from further violation of their respective agreements, and if Parretti and Maldonado are not ordered to comply therewith by, *inter alia*, returning, deleting, and not using and/or disclosing U.S. Security's confidential information and abstaining from further competitive activities in violation of their agreements.

## <u>COUNT IV:  BREACH OF FIDUCIARY DUTIES OF LOYALTY</u>
### (As to Parretti and Maldonado)

107.

Plaintiffs incorporate by reference Paragraphs 1 through 86 of the Complaint, as if fully set forth herein.

108.

In his role as Regional Manager at U.S. Security, Parretti was placed in a position of trust and confidence, was given substantial managerial and oversight responsibilities, was given access to confidential and trade secret information, and, as a result of his employment with U.S. Security, developed customer goodwill with U.S. Security's customers.   Parretti was expected to devote his full time to the management and promotion of U.S. Security's business interests.

109.

In her role as Director of Operations at U.S. Security, Maldonado was placed in a position of trust and confidence, was given substantial managerial and oversight responsibilities, was given access to confidential and trade secret information, and, as a result of her employment with U.S. Security, developed customer goodwill with U.S. Security's customers.  Maldonado was expected to devote her full time to the management and promotion of U.S. Security's business interests.

110.

As a result of this special relationship and privilege, Parretti and Maldonado owed certain fiduciary duties to U.S. Security including, but not limited to, fiduciary duties of loyalty and honesty, and duties to not to act in a way contrary to the interests of U.S. Security.

111.

Based on this fiduciary relationship, Parretti and Maldonado owed, among other things, a duty to refrain from misappropriating trade secret or confidential information, business or business opportunities from U.S. Security, a duty to act in the best interests of U.S. Security, and a duty not to work on behalf of a competing business or undermine U.S. Security's  while employed by U.S. Security.

112.

During the course of their employment with U.S. Security, Parretti and Maldonado breached their fiduciary duty by, among other things, creating, managing, working for, and/or acting in the interests of a competitor while still employed with U.S. Security; misappropriating U.S. Security's confidential proprietary and trade secret information for their own benefit and/or the benefit of CPS; and using or disclosing U.S. Security's confidential proprietary and trade secret information for the benefit of themselves and CPS contrary to U.S. Security's best interests.

113.

As a direct result of Parretti and Maldonado's breach of their fiduciary duties, Plaintiffs have been injured and will continue to suffer damages, in an amount to be determined at trial.

114.

As a direct result of Parretti and Maldonado's breach of their fiduciary duties, they have received compensation that exceeded the value of their work.

## COUNT V:  UNFAIR COMPETITION, M.G.L. C. 93A, § 11
### (All Defendants)

115.

Plaintiffs incorporate by reference Paragraphs 1 through 114 of the Complaint, as if fully set forth herein.

116.

At all times relevant to this action, U.S. Security and Allied Universal have been engaged in trade or commerce within the meaning of M.G.L. c. 93A §§ 2, 11.

117.

CPS also engages in trade or commerce and is a competitor to Plaintiffs in the marketplace.

118.

Defendants Parretti and Maldonado were employees of U.S. Security and, upon information and belief, are now employees of CPS.

119.

Upon information and belief, Defendants Parretti and Maldonado conducted activities for the benefit of CPS while they were still employed by U.S. Security, and they have continued to conduct activities for the benefit of CPS since their resignation from U.S. Security using unfair and deceptive means of competition, including using trade secret information misappropriated from U.S. Security (including, upon information and belief, information knowingly obtained from Malkasian's misappropriation) to divert business from U.S. Security to CPS.

120.

Through their misappropriation of U.S. Security's confidential, proprietary and/or Trade Secret Information, Defendants have used or employed an unfair method of competition and/or an unfair or deceptive act or practice.

121.

As a direct and proximate result of Defendants' misappropriation of U.S. Security's confidential, proprietary and/or Trade Secret Information, U.S. Security and Allied Universal have suffered and will continue to suffer substantial direct and consequential damages in an amount to be determined at trial.

122.

Upon information and belief, Defendants have used the confidential, proprietary and Trade Secret Information misappropriated from U.S. Security to interfere with U.S. Security's contractual and business relationships with its customers, and have thereby induced those

customers to discontinue their business relationships with U.S. Security and enter into business relationships with CPS instead.  The Defendants' wrongful conduct as set forth above affects and harms the open marketplace.

123.

The actions and transactions constituting Defendants' unfair methods of competition and Defendants' unfair and deceptive acts and practices occurred primarily and substantially within Massachusetts.

124.

The actions and transactions constituting Defendants' unfair methods of competition and Defendants' unfair and deceptive acts and practices occurred primarily and substantially within Massachusetts.

125.

Defendants' unfair methods of competition and Defendants' unfair and deceptive acts and practices caused Plaintiffs to suffer monetary damages, including but not limited to monetary damage caused by the loss of business from Customers 1, 2, 3, and 4.  Plaintiffs continue to suffer such damages, in an amount to be determined at trial.

126.

Defendants' actions were willful and intentional.

127.

As a direct and proximate result of the Defendants' wrongful conduct, U.S. Security and Allied Universal have also suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law.

128.

The Defendants' actions have caused and will continue to cause Plaintiffs irreparable harm if not permanently enjoined.

## COUNT VI:  AIDING AND ABETTING BREACH OF CONTRACT
### (CPS)

129.

Plaintiffs incorporate by reference Paragraphs 1 through 128 of the Complaint, as if fully set forth herein.

130.

Based on Parretti's conduct alleged above, Parretti has committed material breaches of the Parretti Agreements.

131.

Based on Maldonado's conduct alleged above, Maldonado has committed material breaches of the Maldonado Agreement.

132.

CPS knowingly and intentionally aided and abetted Parretti and Maldonado in breaching their respective agreements with U.S. Security, by assisting them to work in violation of their agreements and utilizing U.S. Security's Trade Secret Information and customer goodwill to solicit U.S. Security's customers.

133.

By reasons of the foregoing, Plaintiffs have been injured and will continue to suffer damages, in an amount to be determined at trial.

## COUNT VII:  AIDING AND ABETTING BREACH OF DUTY OF LOYALTY
### (CPS)

134.

Plaintiffs incorporate by reference Paragraphs 1 through 133 of the Complaint, as if fully set forth herein.

135.

During the course of their employment with U.S. Security, Parretti and Maldonado breached their fiduciary duties by, among other things, creating, managing, working for, and/or acting in the interests of a competitor while still employed with U.S. Security; misappropriating U.S. Security's confidential proprietary and trade secret information for their own benefit and/or the benefit of CPS; and using or disclosing U.S. Security's confidential proprietary and trade secret information for the benefit of themselves and CPS contrary to U.S. Security's best interests.

136.

CPS acted with knowledge of, or with reckless disregard to, the fact that Parretti and Maldonado were in breach of their fiduciary duties to U.S. Security, and has participated in such breaches of fiduciary duties.

137.

CPS knowingly aided and abetted Parretti and Maldonado's wrongdoing alleged herein. CPS rendered substantial assistance in order to effectuate Parretti and Maldonado's actions.

138.

By reasons of the foregoing, Plaintiffs have been injured and will continue to suffer damages, in an amount to be determined at trial.

## COUNT VIII:  CIVIL CONSPIRACY
### (All Defendants)

139.

Plaintiffs incorporate by reference Paragraphs 1 through 138 of the Complaint, as if fully set forth herein.

140.

Defendants and each of them agreed to act together and in concert with one another, pursuant to a secretive, common plan, scheme and design, to disrupt and injure U.S. Security's business, breach Parretti's and Maldonado's respective agreements with U.S. Security, misappropriate and/or misuse U.S. Security's confidential and Trade Secret Information, and ultimately divert business from U.S. Security, all in knowing breach of Parretti and Maldonado's contractual, common law, and statutory obligations, as well as CPS's common law and statutory obligations.

141.

By their conduct described above, Defendants committed tortious acts in furtherance of their plan, including by knowingly acquiring and using U.S. Security's misappropriated trade secret information to interfere with U.S. Security's contractual and business relationships with its customers.  Each of the Defendants knew of this plan and took affirmative steps to substantially assist the common tortious plan.

142.

As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continues to suffer substantial and irreparable harm.

## COUNT IX:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL AND ADVANTAGEOUS BUSINESS RELATIONS
### (All Defendants)

143.

Plaintiffs incorporate by reference Paragraphs 1 through 142 of the Complaint, as if fully set forth herein.

144.

At all times material hereto, U.S. Security enjoyed contractual relationships with its customers, including, without limitation, Customers 3 and 4.  Specifically with respect to those customers, U.S. Security was a party to a contract with those customers that was not set to expire until a specific date or upon notice of one of the parties.

145.

Notwithstanding the foregoing, Customers 3 and 4 cancelled their contractual relationships with U.S. Security to do business with Defendants.

146.

At all times material hereto, U.S. Security enjoyed advantageous business relationships with customers, including Customer 1, 2, 3, and 4.  Notwithstanding the foregoing, Customers 1, 2, 3, and 4 ceased doing business with U.S. Security and instead did business with Defendants.

147.

Defendants were aware of the above-referenced relationships U.S. Security had with its customers.

148.

Despite their knowledge of the above-referenced contractual relationships, Defendants knowingly, maliciously, and in bad faith interfered with such contractual and advantageous

business relationships by misappropriating U.S. Security's confidential and Trade Secret Information , and by using such misappropriated information in an effort to induce customers to discontinue their business relationships with U.S. Security and enter into a relationship with CPS instead.   Upon information and belief, Defendants successfully induced four such customers, Customers 1, 2, 3, and 4 to discontinue their contractual and business relationships with U.S. Security and to divert their business to CPS.

149.

As a direct and proximate result of CPS's misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm and monetary damages.

## COUNT X:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (CPS)

150.

Plaintiffs incorporate by reference Paragraphs 1 through 149 of the Complaint, as if fully set forth herein.

151.

At all times material hereto, U.S. Security enjoyed a contractual relationship with Parretti and Maldonado.

152.

Despite its knowledge of the above-referenced contractual relationship, CPS knowingly, maliciously, and in bad faith interfered with said contractual relationships by encouraging Parretti and Maldonado to solicit U.S. Security customers and by encouraging Parretti and Maldonado to use or disclose U.S. Security's Trade Secret Information and other confidential information.  Upon information and belief, CPS interfered for the purpose of unlawfully obtaining, through U.S. Security's former employees, U.S. Security's trade secret and confidential information, and in

order to unfairly compete with U.S. Security using such misappropriated information and the confidential information and customer goodwill U.S. Security had entrusted to its former employees.

153.

As a direct and proximate result of CPS's misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm and monetary damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request judgment in its favor and against Defendants as follows:

(a)    That Defendants be preliminarily and permanently enjoined from continuing their unlawful acts as set forth herein;

(b)    Granting to Plaintiffs an injunction enjoining Defendants from using, disclosing, revealing, copying, or misappropriating or threatening to misappropriate any U.S. Security Trade Secret Information or other confidential information;

(c)    Granting to Plaintiffs an injunction ordering Defendants, to immediately return all U.S. Security property that they have in their possession, and to verify in writing that they have returned all such information and have retained no copies of any such information, and provide an accounting for any such information that cannot be returned;

(d)    Awarding actual damages resulting from Defendants' wrongful conduct alleged herein, in an amount to be proven at trial;

(e)    Ordering that Parretti and Maldonado forfeit any compensation received during the period of their breach of fiduciary duty;

(f)     Awarding punitive damages for Defendants' malicious, willful, wanton, and legally unjustified conduct;

(g)     Awarding Plaintiffs pre-judgment and post-judgment interest in an amount to be determined at trial;

(h)     Awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

(i)     Awarding Plaintiffs multiple damages in accordance with G.L. c. 93A, for Defendants' willful and intentional violations of G.L. c. 93A; and

(j)     Granting to Plaintiffs such other and further relief as this Court deems just and proper.

Respectfully submitted, this 26 day of July, 2019.


Eckert Seamans Cherin & Mellott, LLC

*/s/ Charlotte L. Bednar*
Anthony M. Moccia (BBO# 350225)
Charlotte L. Bednar (BBO # 657748)
Two International Place, 16th Floor
Boston, Massachusetts 02110
(617) 342-6828
(617) 342-6899 (facsimile)
amoccia@eckertseamans.com
cbednar@eckertseamans.com

-and-

Wes R. McCart*
Georgia Bar No. 122355
Matthew D. Crawford*
Georgia Bar No. 190109
*Pro Hac Vice Application Forthcoming


MARTENSON, HASBROUCK & SIMON LLP
3379 Peachtree Rd. N.E., Suite 400
Atlanta, Georgia 30326
Telephone: (404) 909-8100
Facsimile: (404) 909-8120
wmccart@martensonlaw.com
mcrawford@martenssonlaw.com


Attorneys for Plaintiff